UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| BERJ HOVSEPIAN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 4:16-CV-414-CEJ |
| | ) |
| CRANE CO., et al., | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM AND ORDER

This matter is before the Court on plaintiff's motion to remand this case for lack of subject matter jurisdiction, pursuant to 28 U.S.C. § 1447(c). The removing defendant, Crane Company, has responded in opposition, and the issues are fully briefed.

### I. Background

Plaintiff Berj Hovsepian initiated this action in the Twenty-Second Judicial Circuit Court of Missouri (City of St. Louis) on December 15, 2015. He asserts claims of strict liability, negligence, willful and wanton misconduct, and conspiracy against 78 defendants.

According to the complaint, plaintiff was a civilian employee of the United States Navy from 1958 until 1964, in Boston, Massachusetts. [Doc. #1-1 at ¶ 1] He was also "employed with Kambien" from 1966 until 1969 and "employed with Polaroid" from 1969 until 1997, in Cambridge, Massachusetts. *Id.* Plaintiff alleges that "[d]uring the course of [his] employment at [those] locations . . . , during non-occupational work projects and/or in other ways, [he] was exposed to and inhaled, ingested or otherwise absorbed asbestos fibers and/or asbestiform fibers emanating

from certain products [he] was working with and around." *Id.* ¶ 2. The asbestos-containing products at issue were allegedly manufactured, sold, distributed or installed by the defendants. The products are not specifically identified in the complaint. In 2012, plaintiff was diagnosed with asbestosis. On September 15, 2015, he was diagnosed with "asbestos-related" mesothelioma. *Id.* ¶ 4. Plaintiff alleges that his illness was caused by exposure to the defendants' products.

Plaintiff attempted to ensure the "action [was] not properly removable on any theory or jurisdictional basis" by "disclaim[ing] any claim for relief for any portion of the injuries sustained upon a federal enclave or as a result of the malfeasance of any persons acting as a federal officer." *Id.* ¶ 5. Indeed, federal subject matter jurisdiction is not apparent on the face of the complaint. However, plaintiff's deposition testimony on February 25, 2016 triggered Crane's right to remove, which it timely exercised on March 25, 2016.[1]

Plaintiff testified that he worked as a marine machinist at the Boston Naval Shipyard in Charlestown, Massachusetts from July 1958 until October 1964. [Doc. #1-2 at 4–5]. In that capacity he was responsible for repairing, replacing, and maintaining the boilers, generators, pumps, turbines, and valves that supplied power to Navy vessels. *Id.* at 11–12, 15–17. Plaintiff never wore a mask or respirator while performing any of that work. *Id.* at 23.

Effectuating the repairs and maintenance required plaintiff to remove asbestos insulation and coatings from valves. *Id.* at 18–20. Plaintiff testified that

---

[1] In support of remand plaintiff suggested removal was untimely because the basis for removal was either discernable on the face of the complaint or from facts of which Crane was aware. [Doc. #201] Plaintiff filed an amended memorandum in support of the motion to remand, in which he appears to have abandoned the timeliness argument. [Doc. #238] In any event, Crane's notice of removal was timely. *See, e.g.*, *Knudson v. Sys. Painters, Inc.*, 634 F.3d 968, 973 (8th Cir. 2011); *Hesser v. Home Depot U.S.A., Inc.*, No. 4:13-CV-227-CAS, 2013 WL 1914435, at *2–5 (E.D. Mo. May 8, 2013).

2

"[e]very one of" the valves he repaired was covered in or contained "gasket[s] made of asbestos." *Id.* at 21. The asbestos would break off the valves, resulting in "fine particles" of white, gray, and black "dust" that plaintiff "[a]bsolutely" inhaled while he worked, "[r]ight on top of it." *Id.* at 20–21. Similarly, the new gaskets and flanges plaintiff installed while repairing valves also contained friable asbestos. *Id.* at 27–28.

Plaintiff knew the material he was discarding and installing contained asbestos. *Id.* at 29–30. He had been told he was working with asbestos. *Id.* at 31–37. Additionally, the new insulation he installed on repaired components arrived packed in boxes labelled, "asbestos packing material." *Id.* Plaintiff testified that the asbestos-containing valves he repaired or newly installed on the Navy vessels were manufactured by Crane. *Id.* at 39–40.

Based on that testimony, Crane removed, asserting federal subject matter jurisdiction pursuant to 28 U.S.C. § 1442(a)(1) and the "federal contractor defense." *Cuomo v. Crane Co.*, 771 F.3d 113, 116–17 (2d Cir. 2014) (explaining the "federal contractor defense"); *see also Boyle v. United Techs. Corp.*, 487 U.S. 500 (1988). In support of removal, Crane submitted evidence of, as relevant here, the Navy's total control over all aspects of Crane's design and manufacture of components for Navy vessels. [Doc. #1-4 at 1–36]

At all relevant times, the Navy published military specifications, or MILSPECs,[2] through which it approved of and strictly controlled the precise design and manufacture of every component installed on its vessels. *Id.* at 10–11. The

---

[2]The bulk of the over seventeen-hundred pages of MILSPECs in evidence are low-quality scans. In some instances those documents are virtually illegible, even under significant magnification. The Court will not consider any materials produced in this case that are unreadable.

3

MILSPECs governed the design and manufacture of all valves used on Navy vessels, whether newly installed or deployed to repair existing components. *Id.* at 11. Corporations that were contracted by the Navy to produce valves and other components were always obligated to comply with the relevant MILSPECs, and only the Navy could modify them. *Id.* at 11–12. As with all other components, the Navy determined precisely which materials were approved for use in the valves it ordered from private contractors. *Id.* The Navy would not accept components from its third-party contractors unless those components conformed precisely to the relevant MILSPECs, and the Navy inspected and tested those components for compliance before accepting them for use on its vessels. *Id.*

The MILSPECs gave detailed instructions with respect to the insulation to be used on all pipes, valves, and other related components aboard Navy vessels. *Id.* at 16. The MILSPECs "provided detailed instructions as to the specific insulating materials to be used, and also as to the amounts of those materials and the manner in which they were to be applied." *Id.* As the MILSPECs required, "the vast majority of thermal insulating materials used aboard Navy vessels contained asbestos" at all times relevant here. *Id.* at 18.

The use of asbestos on Navy vessels was not an oversight, nor did it stem from a lack of awareness of the risks asbestos poses to humans. Specifically, the Navy determined asbestos was required to be used in and on various components of its vessels—despite the known health risks—because asbestos is both lightweight and an excellent thermal insulator. Its fire resistant and thermal insulation qualities were essential to shielding sensitive equipment and crewed compartments from the heat expelled by vessels' steam-generating power plants. In turn, the power plants

4

were mission-critical to supplying the energy necessary to drive ships' weapons and propulsion systems, especially as those systems became more advanced during and after World War II. Asbestos' low mass compared to other available insulators was also a critical factor in the Navy's decision to use it. The heavier the insulation used on a vessel, the less mass it can carry in weapons, ammunition, fuel, crew, and supplies while achieving the same maximum speed. For those and other reasons, the Navy promulgated MILSPECs mandating design and manufacture of asbestos-containing components, and the use of asbestos insulation, on all of its vessels at all relevant times.

By 1922, the Navy knew of at least some of the hazards caused by exposure to asbestos. Beginning as early as 1939, the Navy's medical division "called for the Navy medical officer" on every base or vessel to "instruct the employees in safety measures and encourage them to cooperate in protective measures," including the use of "masks for asbestos workers." [Doc. #1-9 at 12] That same year, the Surgeon General of the Navy addressed the "[h]azard of [a]sbestos," describing asbestosis as, "an industrial disease of the lungs incident to inhalation of asbestos dust for prolonged periods." *Id.* at 12, 15. The Surgeon General was concerned about "continued exposure to present occupational conditions" in the Navy. *Id.* He recommended several methods to reduce or prevent exposure to asbestos, including implementation of training protocols to warn personnel to use respirators while working with asbestos. *Id.*

By "the early 1940s, the Navy had become a leader in the field of occupational medicine related to . . . asbestos dust exposure." *Id.* at 10. On January 31, 1945, for example, the Navy's Chief Health Consultant warned that

some personnel at one naval yard were suffering "asbestosis," which led him to conclude a "fairly serious dust risk" was "very probable" at naval "plants and yards where" asbestos "pipe covering materials are used." [Doc. #1-10 at 61] Also in 1945, a group of Navy physicians published a *Health Survey of Pipe Covering Operations in Constructing Naval Vessels*. [Doc. #1-5 at 58] That report documented that personnel at several Navy facilities "had what appeared to be asbestosis," which the Navy physicians described as, "a well-known industrial disease caused by only one thing—prolonged breathing of asbestos dust." *Id.*

The Navy's early awareness of the hazard explains why, in 1958, the Navy published a *Safety Handbook for Pipefitters*. [Doc. #1-10 at 154] That manual warns: "Asbestos dust is hazardous if inhaled." [Doc. #1-11 at 1] Pipefitters, like plaintiff, were instructed: "Wear an approved dual respirator for protection against this hazard." *Id.* Thus, the Navy adopted safety practices to minimize or prevent exposure to asbestos. But these practices were not universally implemented, where "extensive information regarding potential hazards and potential protective measures . . . [was] consciously not shared with the vast majority of Navy personnel who were deemed not to have a need to know." [Doc. #1-9 at 9] For example, in October 1962, the Navy's *Safety Review* specifically warned of the dangers of asbestos exposure to employees installing asbestos insulation on naval vessels. [Doc. #1-11 at 6–7] In that article, the Navy also revealed it had been aware of that precise risk since as early as 1945. *Id.* at 7.

Crane was contracted to design and manufacture valves for the Navy. The specific contracts applicable to the valves designed and manufactured for use on vessels repaired at the Boston Naval Shipyard from 1958 to 1964 are not in

6

evidence. But "[a]ll equipment supplied by" Crane "to the Navy was built in accordance with the" MILSPECs, which governed "all aspects of a piece of equipment, such as a valve's[] design and construction[,] and specified the materials to be used, including materials such as gaskets and packing . . . ." [Doc. #1-3 at 2] Thus, regardless of what a particular contract for an order of valves plaintiff installed may have stated, every contract between Crane and the Navy would have been governed by the applicable MILSPECs.

As relevant here, those MILSPECs commanded all valves designed and manufactured for use on Navy vessels contain asbestos and be covered by asbestos insulation. For example, the 1959 *Bureau of Ships Technical Manual* mandates all valves, fittings, and flanges, must be insulated with asbestos. [Doc. #1-5 at 68, 79–83] Several other MILSPECs demand asbestos cloth, felt, millboard, and block insulation "shall" be used to insulate all valves. *Id.* at 101; *see also, e.g.*, [Docs. ##1-4 at 141, 149, 159–61; 1-5 at 11–13, 20–22, 96, 100–01] (mandating the use of compressed asbestos sheet packing material, "casing joints" covered in "compressed asbestos sheet gaskets," the use of asbestos "insulating felt" and "rolled asbestos felt," and specifically requiring valves to be covered in asbestos cloth, millboard, and felt, or with asbestos tape). Further, in 1962, the Navy published *Military Standard Thermal Insulation Requirements for Machinery and Piping* that were "mandatory" for all "activities under the cognizance of the Bureau of Ships," including the work plaintiff performed at the Boston Naval Shipyard. [Doc. #1-5 at 105–06] Those 1962 MILSPECs approved exactly six methods of insulating pipes and pipe components, including valves. *Id.* at 111–18. Every one of those approved methods of insulation required the use of asbestos. *Id.*

7

Like all contracted components manufactured for the Navy, Crane's valves were inspected and tested for strict compliance with those MILSPECs. The valves would have been rejected by the Navy if they had not been in compliance. Therefore, at all relevant times, Crane's precise mandate was to produce asbestos-containing valves for the Navy. Consequently, plaintiff could not have been exposed to Crane's valves while working for the Navy if those valves had not contained and been covered in asbestos, as the Navy demanded.

## II. **Legal Standard**

The burden of proving that subject matter jurisdiction exists rests with the party asserting it. *Great Rivers Habitat All. v. Fed. Emergency Mgmt. Agency*, 615 F.3d 985, 988 (8th Cir. 2010); *Altimore v. Mount Mercy Coll.*, 420 F.3d 763, 768 (8th Cir. 2005). A case must be remanded if, at any time, it appears that the district court lacks subject matter jurisdiction. 28 U.S.C. § 1447(c); Fed. R. Civ. P. 12(h)(3). However, the "federal officer removal statute," 28 U.S.C. § 1442(a)(1), is "broader" that other removal statutes, and "is not 'narrow' or 'limited.'" *Willingham v. Morgan*, 395 U.S. 402, 405–06 (1969) (citation omitted). "Under the federal officer removal statute, suits against federal officers may be removed despite the nonfederal cast of the complaint; the federal-question element is met if the defense depends on federal law." *Jefferson Cty. v. Acker*, 527 U.S. 423, 431 (1999); *see Mesa v. California*, 489 U.S. 121, 129–39 (1989). In pertinent part § 1442(a)(1) provides: "A civil action . . . that is commenced in a State court and that is against . . . any officer (or any person acting under that officer) of the United States or of any agency thereof . . . for or relating to any act under color of such office . . . may be removed by" that defendant. 28 U.S.C. § 1442(a)(1).

"The purpose of 28 U.S.C. § 1442(a)(1) is to protect federal officials from civil or criminal liability for the performance of their official duties." *Charges of Unprofessional Conduct Against 99-37 v. Stuart*, 249 F.3d 821, 824 (8th Cir. 2001). The statute "cover[s] all cases where federal officers can raise a colorable defense arising out of their duty to enforce federal law . . . regardless of whether the suit could originally have been brought in a federal court." *Willingham*, 395 U.S. at 406–07. "In fact, one of the most important reasons for removal is to have the validity of the defense . . . tried in a federal court. The [defendant] need not win his case before he can have it removed." *Id.* at 407. For this reason, the Supreme Court has "held that the right of removal is absolute for conduct performed under color of federal office, and has insisted that the policy favoring removal 'should not be frustrated by a narrow, grudging interpretation of § 1442(a)(1).'" *Arizona v. Manypenny*, 451 U.S. 232, 242 (1981) (quoting *Willingham*, 395 U.S. at 407). The Eighth Circuit has held a defendant may remove under § 1442(a)(1) even where a plaintiff has "expressly pleaded" that his claims "cover[] *only* conduct by the individual defendants that in fact was outside the scope of their federal employ." *Brown v. Armstrong*, 949 F.2d 1007, 1010 (8th Cir. 1991).

A defendant must establish four elements to remove on the basis of § 1442(a)(1):

> (1) [the] defendant has acted under the direction of a federal officer, (2) there was a causal connection between the defendant's actions and the official authority, (3) the defendant has a colorable federal defense to the plaintiff's claims, and (4) the defendant is a "person," within the meaning of the statute.

*Jacks v. Meridian Res. Co.*, 701 F.3d 1224, 1230 (8th Cir. 2012) (citations omitted).

First, "[t]he words 'acting under' are broad, and . . . the statute must be

9

'liberally construed," but the term is not "limitless."  *Watson v. Philip Morris Cos.*, 551 U.S. 142, 147 (2007) (citations omitted).  "[T]he fact that a federal regulatory agency directs, supervises, and monitors a company's activities in considerable detail . . . does not . . . bring[] that company within the scope of" the statute "and thereby permit[] removal."  *Id.* at 145.  Rather, "the private person's 'acting under' must involve an effort to *assist*, or to help *carry out*, the duties or tasks of the federal superior."  *Id.* at 151–52 (citations omitted); *see Jacks*, 701 F.3d at 1230–34.  The quintessential example of such a relationship is when a "private contractor . . . is helping the Government to produce an item that it needs," such as "a product that it used to help conduct a war"—a task "that, in the absence of a contract with a private firm, the Government itself would have had to perform."  *Watson*, 551 U.S. at 153–54.

Second, "[w]hen ascertaining whether a removing defendant has made out a 'colorable defense'" and also established "the required causal connection," a court must "credit the [removing defendant's] theory of the case for purposes of" determining if the defendant has "made an adequate threshold showing that the suit is for an act under color of office."  *Acker*, 527 U.S. at 432 (quotation marks, bracketing, and citations omitted).  The "'hurdle erected by this requirement is quite low.'"  *Jacks*, 701 F.3d at 1230 n.3 (quoting *Isaacson v. Dow Chemical Co.*, 517 F.3d 129, 137 (2d Cir. 2008)).  Such a connection is established when the acts "that form the predicate of" a plaintiff's claims "occurred while" the defendant "performed its duties under the direction of a federal officer or agency."  *Id.*

Third, "[f]or a defense to be considered colorable, it need only be plausible; § 1442(a)(1) does not require a court to hold that a defense will be successful

before removal is appropriate." *United States v. Todd*, 245 F.3d 691, 693 (8th Cir. 2001) (citing *Willingham*, 395 U.S. at 406–07). As to the defense asserted here, "[d]isplacement" of state law "will occur only where . . . a significant conflict exists between an identifiable federal policy or interest and the operation of state law," but the "conflict with federal policy need not be as sharp as that which must exist for ordinary pre-emption . . . ." *Boyle*, 487 U.S. at 507. "The imposition of liability on Government contractors will directly affect the terms of Government contracts . . . ." *Id.* Even so, federal preemption does not exist if a "contractor could comply with both its contractual obligations and the state-prescribed duty of care." *Id.* at 509; *see O'Melveny & Myers v. FDIC*, 512 U.S. 79, 88 (1994) (describing when preemption does not exist).

Rather, "[w]here the government has directed a contractor to do the very thing that is the subject of the claim," it is "a special circumstance where the contractor may assert a [federal] defense" to state tort liability. *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 74 n.6 (2001) (citation omitted); *see Hercules Inc. v. United States*, 516 U.S. 417, 419 (1996). Federal law therefore displaces state tort law, "where the state-imposed duty of care that is the asserted basis of the contractor's liability . . . is precisely contrary to the duty imposed by the Government contract (the duty to manufacture and deliver [components] . . . shown by the specifications)." *Boyle*, 487 U.S. at 509; *see Hercules*, 516 U.S. at 419–20 (holding no liability arose from, *inter alia*, an "Agent Orange" manufacturer's failure to label its products where the government had "prescribed the formula and detailed specifications for manufacture" and had forbid all warning labels). Consequently, "[l]iability for design defects in military equipment cannot

11

be imposed, pursuant to state law, when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." *Boyle*, 487 U.S. at 512–13; *see United States v. Bame*, 721 F.3d 1025, 1030 n.4 (8th Cir. 2013); *Lowry v. McDonnell Douglas Corp.*, 211 F.3d 457, 458 (8th Cir. 2000). The third element is satisfied where the contractor shows the government "had superior knowledge of the hazards" to that of the contractor. *Hercules*, 516 U.S. at 426.

Finally, "the 'person' contemplated by the federal officer removal statute includes corporations." *Jacks*, 701 F.3d at 1230 n.3 (citing *Watson*, 551 U.S. at 152–53). The Eighth Circuit does "not require that these defenses be clearly sustainable in order to support removal under § 1442(a)(1)." *Id.* at 1235 (citing *Willingham*, 395 U.S. at 406–07). At the removal stage, as here, a court is to determine only whether "these defenses are indeed colorable[,] . . . mak[ing] no determination as to their merits," and only deciding whether "a federal forum is available to adjudicate th[e] matter." *Id.*

### III. Discussion

Plaintiff advances two arguments in support of remand. First, he explicitly abjured federal subject matter jurisdiction in the complaint, disclaiming any cause of action against a federal officer. But "suits against federal officers may be removed despite the nonfederal cast of the complaint; the federal-question element is met if the defense depends on federal law." *Acker*, 527 U.S. at 431. A defendant may remove under § 1442(a)(1) even where a plaintiff has "expressly pleaded" that his claims "cover[] *only* conduct by the individual defendants that in

fact was outside the scope of their federal employ." *Brown*, 949 F.2d at 1010. The complaint's purported waiver of all grounds for federal subject matter jurisdiction is thus of no moment. *See id.*

Second, plaintiff argues that Crane has not met its burden to show federal subject matter jurisdiction exists under § 1442(a)(1). It bears mention that the Ninth, Second, and Seventh Circuits have all denied remand of asbestosis and mesothelioma claims against suppliers of asbestos-containing parts to the Navy where the cases were removed to federal court pursuant to § 1442(a)(1) on the basis of the federal contractor defense. *See Leite v. Crane Co.*, 749 F.3d 1117, 1123 (9th Cir.), *cert. denied*, 135 S. Ct. 361 (2014); *Cuomo*, 771 F.3d 113; *Ruppel v. CBS Corp.*, 701 F.3d 1176 (7th Cir. 2012). Crane was the removing defendant in two of those cases, and it had supported its removal with the same jurisdictional evidence it submitted here. *See Leite*, 749 F.3d at 1120, 1123–24 (discussing Crane's jurisdictional evidence); *Cuomo*, 771 F.3d at 114–17 & n.2 (*inter alia*, explicitly rejecting the argument raised here that, because Crane "produced no copies of its own procurement contracts with the Navy," it could not establish the "federal contractor defense," and holding that, "examples of the Navy's customary specifications and testimony that Crane's valves conformed to those specifications"—the same evidence here—"satisf[ied] Crane's burden under § 1442(a)(1) even absent specific evidence of Crane's own contracts"). Plaintiff does not attempt to distinguish those highly persuasive authorities, two of which reversed district courts for remanding, exactly as plaintiff urges. *See Cuomo*, 771 F.3d at 117; *Ruppel*, 701 F.3d at 1186 (holding a complaint pled both use-of-asbestos and failure-to-warn claims, either of which suffices to remove the case).

In any event, under Supreme Court and Eighth Circuit precedent, plaintiff's attempt to remand fairs no better. Among other things, plaintiff alleges Crane is liable for designing and manufacturing valves that contained and were insulated with asbestos—*i.e.*, use-of-asbestos claims. [Doc. #1-1 at ¶¶ 9(a), 18(a)] Plaintiff's contentions regarding his failure-to-warn claims are thus immaterial to the inquiry, because the entire case is removable if even one claim falls within the scope of the statute. *See* 28 U.S.C. § 1442(a)(1); *Acker*, 527 U.S. at 431; *Mesa*, 489 U.S. at 129–39; *Manypenny*, 451 U.S. at 242; *Willingham*, 395 U.S. at 406–07.

As to the use-of-asbestos claims, the jurisdiction evidence demonstrates that at all relevant times Crane was acting under the direction of the Navy when it assisted the Navy in carrying out its duty to develop components for vessels critical to the national defense. *See Watson*, 551 U.S. at 151–52; *Jacks*, 701 F.3d at 1230–34. The Navy's directive to Crane to produce the asbestos-containing valves it needed for ships of war is the archetypal example of a contractor "acting under" government direction. *See Watson*, 551 U.S. at 153–54. Crediting Crane's theory of the case, its evidence demonstrates it included asbestos in and on the valves because it conformed the valves to the MILSPECs, which it had no choice but to follow, and which mandated the valves include asbestos. Crane has thus cleared the low hurdle to show a causal connection between its decision to include asbestos on and in the valves and the Navy's directive to do so. *See Acker*, 527 U.S. at 432; *Jacks*, 701 F.3d at 1230 n.3. Crane also qualifies as a person under § 1442(a)(1). *See Jacks*, 701 F.3d at 1230 n.3.

Finally, Crane has established a colorable federal contractor defense. *See Boyle*, 487 U.S. at 512–13. The Navy approved exacting MILSPECs stringently

14

requiring all valves Crane designed and manufactured contain asbestos.  *See id.*  The valves were inspected and tested for compliance with the MILSPECs, and would have been rejected if nonconforming.  *See id.*  That the valves were accepted for use on the vessels where plaintiff then installed them demonstrates they conformed to the MILSPECs.  *See id.*  The Navy also knew at least as much as Crane about the risks of asbestos, both generally and specifically to individuals who, like plaintiff, were hired to install asbestos-containing parts on Navy vessels.  *See Hercules*, 516 U.S. at 426.  Therefore, Crane has adduced sufficient evidence to have the merits of its colorable federal contractor defense adjudicated in federal court, and plaintiff's motion to remand must be denied.  *See Jacks*, 701 F.3d at 1235.

****

For the reasons discussed above,

**IT IS HEREBY ORDERED** that plaintiff's motion to remand [Doc. #200] is **denied**.

_____
CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 5th day of August, 2016.